RECEIVED
IN ALEXANDRIA, LA

MAR - 2 2010

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| JENNIFER LEAH WHITE | : | DOCKET NO. 07-1871 |
| VS. | : | JUDGE TRIMBLE |
| STATE FARM FIRE & CASUALTY COMPANY | : | MAGISTRATE JUDGE KAY |

### MEMORANDUM RULING AND ORDER

Before the Court is "State Farm's Motion *In Limine* to Exclude from Evidence the Report and Testimony of Plaintiffs' Purported Expert, Charles Norman and Request for Evidentiary *"Daubert"* Hearing" (doc. #48). Defendant, State Farm Fire & Casualty Company ("State Farm"), seeks to exclude the testimony of Plaintiff's expert witness, Charles Norman, pursuant to Federal Rules of Evidence 104(a), 702, 703 and 403. State Farm further requests that this Court set an evidentiary *"Daubert"* hearing.

State Farm maintains that Mr. Norman's proffered expert testimony and opinions on damages causation are not based on a reliable methodology; thus, they are inadmissible under Rule 702. State Farm further maintains that because Mr. Norman repeatedly exaggerated, embellished and misrepresented his academic and professional qualifications and credentials in sworn testimony before this and other courts in Louisiana, his testimony is entitled to no weight and should be excluded in its entirety.

### FACTUAL STATEMENT

Plaintiff's residence was struck by Hurricane Rita on or about September 23rd and 24th of

2005, allegedly causing severe damage as a result of the high winds and extreme weather conditions.[1] A number of trees knocked down by the high winds fell on the residence.[2] State Farm had issued a policy of insurance to Plaintiff during the time of the hurricane.[3] Plaintiff alleges that even though she submitted sufficient proof of loss, State Farm has failed to properly deliver sufficient funds to satisfy the coverage guaranteed by the policy.[4] Therefore, Plaintiff seeks to be fully compensated for the damages to her home, and she additionally seeks penalties and attorneys fees pursuant to Louisiana Revised Statutes 22:658 and 22:1220.[5]

State Farm defends its actions alleging that it has properly paid Plaintiff $96,058.77 to repair the damage caused by the fallen trees as well as other Rita-related damages.[6] State Farm asserts that Plaintiff's latent defect claims are based on the proffered testimony of her expert, Charles R. Norman. Mr. Norman opines that Plaintiff's house sustained major latent structural damages during Hurricane Rita, attributing the damages to two contributing factors: (1) winds in excess of 120 mph, and (2) two trees that fell on the roof of the house.

State Farm complains that (1) Mr. Norman's wind-twisting theory is factually and methodologically unsound, (2) Mr. Norman's theory, that the toppled trees struck Plaintiff's roof with enough force to damage the foundation, depends on his use of over simplistic physics equations

---

[1] Petition for Damages, ¶¶ 2 and 3.

[2] *Id.*

[3] *Id.* ¶ 4.

[4] *Id.* ¶ 7.

[5] *Id.* ¶ 9.

[6] State Farm memorandum, p. 7.

2

to model the force, (3) Mr. Norman failed to consider alternative causes for the alleged structural damage, and (4) Mr. Norman repeatedly embellished, exaggerated and misrepresented his credentials in this and other insurance coverages cases.

Federal Rule of Evidence 702 provides the following regarding expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

"The trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[7] The party offering expert testimony must prove by a preponderance of the evidence that the proffered evidence satisfies the criteria of Federal Rule of Evidence 702.[8] "The court must determine that the reasoning and methodology underlying the testimony is scientifically valid and that the reasoning and methodology can properly be applied to the facts in issue."[9] Rule 702 has three major requirements: (1) qualifications, (2) reliability, and (3) relevance.[10]

Furthermore, this Court must fulfill a "gatekeeping role" that requires it to make a threshold "assessment of . . . whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the

---

[7] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[8] *Mathis v. Exxon Corp.*, 302 F.3d 448, 459-60 (5th Cir. 2002).

[9] *Allen v. Pennsylvania Engineering Corp.*, 102 F.3d 194, 196 (5th Cir. 1996) citing *Daubert*, 509 U.S. at 592-93.

[10] *Smith v. Fifthian*, 2006 U.S. Dist. LEXIS 51054, *4-5 (W.D. La. July 26, 2006).

facts in issue."[11] Throughout the evaluation, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.[12]

The Court has reviewed and considered the parties' complaints and/or arguments concerning Mr. Norman's damage causation analysis and we believe that a *Daubert* hearing is warranted.

*Alleged misrepresentations of Mr. Norman's qualifications*

State Farm alleges that "Mr. Norman has repeatedly and seriously exaggerated, embellished, and misrepresented his academic and professional qualifications in sworn testimony to both state and federal courts in Louisiana. . . ."[13] Thus, State Farm maintains that this court cannot give any weight to his testimony. State Farm alleges that Mr. Norman has misrepresented or embellished his academic credentials by (1) testifying that he is *currently* a doctoral candidate in engineering at Lamar University, (2) claiming that he taught some courses at McNeese University including a course in wetlands, soil mechanics and soil testing, (3) misrepresenting his credentials concerning his ability to evaluate wind damages when he "testified that he 'went to Colorado State University[("CSU")] in wind tunnel testing,'[14]"[15] and (4) mis-characterizing his B.S. in Engineering Technology and M.S. in Engineering as a Master's degree in "wind, oceanographic engineering and structural dynamics," and his undergraduate degree as a double major in civil and petroleum

---

[11] *Daubert,* 509 U.S. at 592-93, 97.

[12] *Id.* At 589.

[13] State Farm memorandum, p. 25.

[14] State Farm exhibit O, p. 2,

[15] State Farm memorandum, p. 27.

4

engineering.[16]

Plaintiff submits the following regarding Mr. Norman's candidacy for a doctorate degree. While a professor at McNeese State University in 1999, Mr. Norman was granted a sabbatical to attend Lamar University to obtain his doctorate.[17] He attended four semesters and those classes, coupled with transferable hours he took at McNeese, put him a thesis and dissertation short of his goal of a doctorate.[18] According to Lamar's catalog, a total of 30 classroom credit hours is required.[19] When asked about his doctoral candidacy by State Farm, Mr. Norman testified that he is a doctoral candidate. In another case, entitled *Jonathan Areno, et ux v. State Farm Fire & Casualty Company,* Docket no. 2006-3492, 14th Judicial District Court, Mr. Norman answered State Farm's question regarding his doctoral candidacy as follows:

A    I've been working on my doctorate at Lamar University for some time. I have not completed that, but I am a doctoral candidate at Lamar.[20]

The Court has reviewed the various deposition testimonies by Mr. Norman submitted by State Farm and concludes that Mr. Norman did not embellish or try to mislead when explaining his status as a doctoral candidate.

State Farm complains that Mr. Norman was untruthful when he testified that he taught a class

---

[16] *Id.*

[17] Plaintiff's exhibit 3, Norman affidavit.

[18] Mr. Norman obtained 12 credit hours from McNeese State University in Graduate Studies and 24 hours from Lamar University. Plaintiff's exhibits 15 and 16.

[19] Plaintiff's exhibit 17.

[20] State Farm exhibit 0, p.2.

regarding wetlands and soil mechanics. Plaintiff submits the affidavit of Mr. Uppot who declares that:

> Charles Norman was a professor at McNeese State University selected to teach soil science, soil mechanics, surveying, ocean wave theory, and coastal design of structures for erosion control for the Young Scholar's Program. The Young Scholar's program included college level material and instruction.[21]

In his deposition, Mr. Norman clearly explained to State Farm that the class was offered to High School Seniors as part of The Young Scholars at McNeese and not a McNeese College course.[22] Thus, the Court concludes that Mr. Norman did not embellish or misrepresent his participation in teaching this class.

State Farm complains that Mr. Norman misrepresented his credentials concerning his ability to evaluate wind damages. State Farm alleges that in another case, *Areno, supra,* Mr. Norman implied that he had been enrolled at the University of Colorado for research activities. In his deposition of the *Areno* case, Mr. Norman testified when asked about his educational background as follows: "I've had specialized training in wind engineering at FEMA. I've been to the University of Colorado at Boulder in wind engineering methodology. I went to Colorado State University in wind tunnel testing. . . ."[23] State Farm then asserts that it was only after Mr. Norman was exposed, did he change his testimony wherein he admitted that "he had actually only attended a short classroom course on wind damages conducted by FEMA that happened to be held on the University

---

[21] Plaintiff's exhibit 8, ¶ 7.

[22] State Farm exhibit E, p. 108.

[23] State Farm exhibit 0, p.2.

of Colorado campus."[24]

Plaintiff points out that the first time Mr. Norman was questioned in this case about the wind tunnel or wind experimental work at Colorado State University, that he provided the following testimony:

> Q. Have you ever done any wind tunnel or wind experiment work at Colorado State University?
>
> A. Yes, I took a course through FEMA and included in that course was a classroom on wind and we went to Colorado State University and then also to a commercial site and I received training in commercial wind tunnel testing - - or particularly of high-rise buildings.
>
> Q. When was that?
>
> A. That was sometime in the mid 1900's - - not 1999.
>
> Q. '99, Okay. And you said it was a course through FEMA?
>
> A. Yes.
>
> Q. What was the course called?
>
> A. Wind engineering.
>
> Q. And where was it taught out of, if you will?
>
> A. University of Colorado at Boulder.
>
> Q. Did you receive any certification of completion or anything like that at the end of the course work?

---

[24] State Farm memorandum, p. 27.

A. Yes.[25]

The Court concludes that Mr. Norman did not misrepresent or embellish his credentials regarding wind tunnel damages or testing at the University.

State Farm complains that Mr. Norman consistently embellished his undergraduate and Master's degrees to bolster his "so-called credentials." State Farm alleges that while under oath, Mr. Norman "characterized his B.S. in Engineering Technology and M.S. in Engineering from Southern Illinois University as a Master's degree in 'wind, oceanographic engineering and structural dynamics,'[26] and his undergraduate degree as a double major in civil and petroleum engineering."[27] State Farm states that in truth, Mr. Norman holds an Engineering Technology degree and a Master's degree of Engineering. The Court has reviewed the deposition of Mr. Norman wherein State Farm alleges that Mr. Norman embellished his academic credentials. In one of the cases,[28] Mr. Norman testified in his deposition on page 2 that he had "a Bachelor's degree in engineering and I have a Master's degree in engineering."[29] and further into the deposition the following colloquy took place:

Q. Your undergraduate degree, is that in - - did you have two majors? You testified that you've had two majors, civil and petroleum engineering; is tha - -

---

[25] State Farm exhibit E, p. 213.

[26] State Farm exhibit U, Moran Depo. pp. 62-63, in *Boudreaux v. State Farm Fire & Cas. Co.*, Docket no. 06-1653 (W.D. La.).

[27] State Farm exhibits O, p. 11 and N, p. 15.

[28] *Areno, supra.*

[29] State Farm exhibit O, p.2.

> A. Yes. My undergraduate, yes.

In another case,[30] the following colloquy took place:

> Q. Can you give me a brief summary of your educational background?
>
> A. A bachelor of science in engineering, a master of science in engineering. I'm a doctoral student in engineering - - I'm a doctoral student in engineering sciences at Lamar University.
>
> Q. Okay. When you say, "engineering," is it more specific with respect to the field of engineering that your degrees are held in?
>
> A. Yes. In the bachelor level, I concentrate on civil and petroleum. In the master's level, I concentrate on structural dynamics and wind and oceanographic engineering. . . .

The Court does not find that Mr. Norman was attempting to misrepresent or embellish his degrees in these two cases.

*Scholarly publications*

State Farm complains that Mr. Norman, in an attempt to establish himself as an expert in the field of wind engineering, misrepresented his scholarly publications. State Farm alleges that Mr. Norman, in this case and in other cases in this district, submitted a list of seven (7) allegedly peer-reviewed and published papers regarding wind science he has authored within the past three years.[31] State Farm alleges that Mr. Norman's publications are overstated in number and do not meet the

---

[30] *McGee, supra.*

[31] State Farm exhibit V, Norman depo., p. 64, line 9 - p. 65, line 6; State Farm exhibit Z, Norman aff., ¶¶ 11-2, 20-1, 32-3, 37, and 39; *Frankland v. State Farm,* 07-1767, Doc. # 71-1 (list of publications attached to exhibit 1).

definition of "peer reviewed" or "published" as those terms are employed in the scientific community. State Farm seems to be concerned that Mr. Norman testified that about seven (7) or eight (8) of his papers had been "published" in a book or magazine and later recanted and testified that these papers had only been "peer reviewed" and presented at various conferences. Mr. Norman testified as follows:

> Q.   Okay, This particular paper in 2006, where was it published?
>
> A.   It - - it was - - there was a book. A mag. . . . - - kind of a magazine, and then the paper was published at that - - you could pick up the papers at the proceedings. . . .

The entire colloquy between State Farm and Mr. Norman encompasses the peer review process itself for a paper to be presented at a conference. State Farm challenges Mr. Norman's explanation as to how the "paper" was presented in form at the conference. Mr. Norman attempted to explain that the paper was "published" in a type of book or magazine. The Court has read the entirety of Mr. Norman's testimony and concludes that Mr. Norman was not attempting to deceive anyone by testifying that his paper had been published in a book or a magazine (in fact, Mr. Norman did not even attempt to mention a title to a book or magazine), rather Mr. Norman was attempting to describe the medium in which the paper was presented to the participants of the conference. After reading Mr. Norman's testimony, the Court concludes that Mr. Norman never attempted to state that his papers were published in a book or magazine other than in the papers presented at the conference. State Farm's allegations are not only entirely without merit, but are very disconcerting and duplicitous.

State Farm next maintains that Mr. Norman's testimony that his papers were peer reviewed

was misleading relying on the testimony of Dr. Leighton Cochran who testified that the review given to papers submitted for presentation at an industry conference does not constitute "peer review."[32] Plaintiff submits a book entitled "Forensic Engineering 2009" which contains two articles written by Norman.[33] Plaintiff remarks that on page iii of the book, it clearly states that these are "peer reviewed technical papers." Plaintiff further submits a copy of a diskette jacket from the ASCE Publications and Marketing Department which contains the paper Mr. Norman presented to the Vancouver Conference in April of 2008. Plaintiff refers the Court to Plaintiffs' exhibits 13 and 18 which includes three (3) examples of articles written by Mr. Norman that have been peer reviewed.

The Court is just as concerned with Mr. Norman's testimony that he has published at least seven (7) or eight (8) papers that have been "peer reviewed."[34] Plaintiff has been able to only present evidence of three (3) papers authored by Mr. Norman. Hence, the Court will allow State Farm to cross examine Mr. Norman at trial as to the remaining four (4) or five (5) articles that Mr. Norman claims to have published and/or peer reviewed.

## CONCLUSION

For the reasons set forth above, the Court finds that State Farm's position that Mr. Norman's testimony should be excluded because he allegedly embellished, exaggerated or misrepresented his credentials and/or qualifications is without merit. The Court further finds that a *Daubert* hearing as to Mr. Norman's damage causation analysis is necessary for this Court to determine if Mr. Norman's

---

[32] State Farm exhibit X, p. 37, lines 17-22.

[33] "Damage Assessment of Houses and Buildings from an Engineering Point of View" and "Distinguishing between Storm Surge and Wind Damages to Buildings and Structures."

[34] State Farm exhibit V, p. 64. Norman depo. in *Franklin v. State Farm*, Docket no. 07-176; State Farm exhibit Z, ¶ ¶ 11, 20 32, 39 (attachment, exhibit 1).

opinions are reliable and admissible. Accordingly, it is

**ORDERED** that the motion in limine is hereby **DENIED** to the extent that the Court will not exclude Mr. Norman's testimony based on State Farm's allegations that he embellished, exaggerated or misrepresented his credentials and/or qualifications.

**IT IS FURTHER ORDERED** that a *Daubert* hearing is hereby **SET** for March 16, 2010 at 10:00 a.m. before the undersigned in Lake Charles, Louisiana in court room #1.

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 2nd day of March, 2010.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE